[Cite as *In re P.Z.A.*, 2023-Ohio-2000.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN RE: P.Z.A., P.M.A., P.G.G.A., P.Y.A.,  :
P.T.P.  :

 :    C.A. No. 29711

 :

 :    Trial Court Case Nos. F-2012-005340;
 :    F-2013-007644; F-2014-007775;
 :    F-2016-002295; F-2019-001794

 :

 :    (Appeal from Common Pleas Court-
 :    Juvenile Division)

. . . . . . . . . . .

O P I N I O N

Rendered on June 16, 2023

. . . . . . . . . . .

ROBERT ALAN BRENNER, Attorney for Appellant, Mother

MICHAEL P. ALLEN, Attorney for Appellee, Montgomery County Children Services

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Mother appeals from a final judgment awarding permanent custody of her five children to Montgomery County Department of Jobs and Family Services-Child Services Division ("MCCS"). The father of four of the children did not file an appeal; the father of the fifth child (P.T.P.) is unknown. The five children are: P.Z.A., P.M.A.,

P.G.G.A., P.Y.A., and P.T.P.[1]

**{¶ 2}** According to Mother, the juvenile court abused its discretion when it terminated her parental rights and awarded permanent custody of the children to MCCS. Mother argues that she had completed her case plan and should have been reunified with the children. After reviewing the record, we disagree and find no abuse of discretion. Therefore, the juvenile court's judgment will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 3}** Mother has had a lengthy history with MCCS. Mother herself had been removed from her mother's care at a young age and had then aged out of the foster care system in April 2015. At that time, Mother already had three children: Patty (born in 2011); Peter (born in 2013); and Pam (born in 2014). Another child, Penny, was born in 2015, and the fifth child, Patrick, was born in 2019.

**{¶ 4}** MCCS's first neglect and dependency complaint was filed in July 2012 regarding Patty. After adjudicating Patty as abused, neglected, and dependent, the court gave MCCS temporary custody of Patty on October 31, 2012. Within a few days of Peter's birth, MCCS filed a dependency complaint and received temporary custody of Peter on March 11, 2014. In December 2014, MCCS also filed a dependency complaint concerning Pamela and received temporary custody of her on March 18, 2015.

**{¶ 5}** MCCS then filed a motion asking that Mother be given legal custody of the

---

[1] Because five children are involved and they have similar initials, we will use pseudonyms to avoid confusion. The children are, from eldest to youngest: P.Z.A. ("Patty"); P.M.A. ("Peter"); P.G.G.A. ("Pam"); P.Y.A. ("Penny"); and P.T.P. ("Patrick").

children, and the motion was granted on April 27, 2015. At that time, Penny had not yet been born. MCCS filed another neglect and dependency complaint on April 7, 2016. According to that complaint, Mother had been evicted from her housing, had left the children with their maternal great-grandmother (G.P.) for days while not ensuring that G.P. had a way to reach her, and had failed to provide G.P. with food and financial support for the children. Neglect and Dependency Complaint, J.C. No. 2016-2295 (Apr. 7, 2016).[2] The complaint further noted that on March 16, 2016, Mother had agreed to an in-home safety plan, leaving the children with G.P. Mother had also agreed to live with G.P. but had not complied with the requirements. *Id.* at p. 1-2. MCCS's preferred disposition was for G.P. to be given temporary custody. *Id.* at p. 2.

{¶ 6} On May 4, 2016, the court granted G.P. interim temporary custody of the children. However, on May 13, 2016, the Dayton Police Department removed the children from G.P.'s custody and placed them in MCCS's emergency custody. MCCS then filed an amended neglect and dependency complaint on May 16, 2016, noting these facts. After finding probable cause for the removal, a magistrate granted MCCS interim temporary custody on May 17, 2016. Subsequently, the court adjudicated all four children neglected and dependent and granted MCCS temporary custody of them on June 16, 2016. Magistrate's Decision and Judge's Order (June 16, 2016), p. 2-3.

{¶ 7} In February 2017, MCCS asked for a first extension of temporary custody, stating that Mother had not completed her case plan and was struggling with the plan.

---

[2] Although five cases are involved here, we will refer to the docket in J.C. No. 2016-2295, unless otherwise indicated. We will also refer to pleadings in the singular form, even though the same pleadings were made in five cases, not just one.

Motion and Affidavit for a First Extension of Temporary Custody to MCCS (Feb. 24, 2017), Affidavit ("Aff."), p. 1. After a hearing, the court granted the first extension of temporary custody. Magistrate's Decision and Judge's Order (Apr. 4, 2017). A second extension of custody was later granted and was set to expire on April 17, 2018. Magistrate's Decision and Judge's Order (Nov. 1, 2017).

{¶ 8} In February 2018, MCCS filed a motion seeking a grant of legal custody to mother with protective supervision for MCCS. After finding that Mother had made significant progress on her case plan, the court granted the motion on April 9, 2018. Magistrate's Decision and Judge's Order (Apr. 9, 2018), p. 3. In addition, the court granted MCCS protective supervision for 12 months. *Id.* at p. 4.

{¶ 9} Less than a year later, MCCS filed a motion and affidavit again seeking temporary custody of the children. According to the affidavit, Mother's home conditions had continued to deteriorate, Mother was then incarcerated, and there were no able, willing, and appropriate caregivers for the children. Motion and Affidavit for Temporary Custody to MCCS and Interim Order (Mar. 6, 2019), Aff., p. 1. The affidavit also said that MCCS had been notified of Mother's March 6, 2019 arrest for carrying concealed weapons and improper handling of a firearm in a vehicle and that the children were in the car at the time. *Id.* The same day, MCCS filed a motion for ex parte custody. The court then granted interim temporary custody to MCCS on March 7, 2019. Magistrate's Interim and Final Order (Mar. 7, 2019), p. 2.

{¶ 10} In April 2019, Mother delivered the fifth child, Patrick, and MCCS filed a dependency complaint concerning this child as well. In addition to the other issues

detailed in the filings, Patrick had tested positive for marijuana in his system. GAL Report to the Court (May 28, 2019), p. 2. After holding a hearing on May 28, 2019, the court granted MCCS's motion for temporary custody of all the children. Magistrate's Decision and Judge's Order (May 28, 2019); *see also* J.C. No. 2019-1794, Magistrate's Decision and Judge's Order (May 28, 2019).

{¶ 11} At this point, MCCS's goal was still to reunify the children with Mother. *See* J.C. No. 2016-2295, Semiannual Administrative Review ("SAR"), Case Review (filed on June 11, 2019), p. 1. According to the review, Mother was living with a new "paramour," T.S., who had a "vast criminal history" and was not supposed to have guns. *Id*. at p. 3. However, guns were in the house, and Mother and T.S. were driving around with guns in the car. *Id*. The review further remarked that Mother's house was in disrepair, doors were "hanging," holes were in the walls, and cockroaches were in the home. *Id*. Additionally, the review said that two children had reported that domestic violence had been committed against them in their home. *Id*.

{¶ 12} In the next case review, MCCS stated that Mother's address was unknown, Mother had made minimal progress on the case plan, Mother was reported to be homeless, and Mother had not provided proof of income. SAR, Case Review (filed on Dec. 5, 2019), p. 1 and 5. At that time, Mother was on felony probation and, due to Mother's known historical use of alcohol and marijuana, MCCS expressed concern that Mother might be drinking and using marijuana. *Id*. at p. 2 and 5. The review also stated that Mother had been invited to all of Patrick's (the baby's) medical visits but had not attended any. *Id*. at p. 4.

{¶ 13} On February 5, 2020, MCCS filed motions for permanent custody of all five children. The affidavits accompanying the motions stated that Mother had not consistently visited with the children, had not made significant progress on case plan objectives, did not have stable housing, and had not provided income verification. The affidavits further said that MCCS had not been able to obtain drug screens because Mother had not met face-to-face with the agency and had not met for a home visit since October 2019. Motion and Affidavit for Commitment to the Permanent Custody of MCCS (Feb. 5, 2020), Aff., p. 1. In addition, the affidavit said that while home studies had been done, no relatives were able, willing, and appropriate to care for the children. *Id.* at p. 1-2. At the time, MCCS was unable to locate an address for Mother.

{¶ 14} After a February 18, 2020 hearing, the court set a permanent custody hearing for May 4, 2020. However, the court then vacated the May hearing in light of the temporary suspension of non-emergency hearings due to the Covid-19 pandemic. The hearing was rescheduled to August 10, 2020. Magistrate's Interim and Final Order (Apr. 9, 2020), p. 1-2. The next case review noted the same concerns as had been previously expressed and stated that Mother was pregnant with her sixth child. SAR (filed on June 8, 2020), p. 2, 3, and 5-8.

{¶ 15} The August 10, 2020 hearing was converted to a pretrial, and the court then filed an order establishing various deadlines, including that trial be held on November 30, 2020. Shortly before the hearing, the guardian ad litem ("GAL") filed a report recommending that permanent custody of the children be given to MCCS. GAL Report to the Court (Nov. 6, 2020), p. 6. Subsequently, the court filed a decision granting first

and second extensions of temporary custody, to expire on March 6, 2021. This was by the parties' agreement. A case review hearing was set for February 9, 2021. Magistrate's Decision and Judge's Order (Nov. 22, 2020), p. 1-3.

{¶ 16} On February 8, 2021, MCCS filed a motion and affidavit for permanent custody, again stating that Mother had failed to make significant progress on her case plan. The court then set a permanent custody trial for May 19, 2021. An amended motion for permanent custody was then filed, updating some information. This included statements that Mother had been discharged from the Artemis program (for domestic violence) because she continued to see her "paramour," T.S.; that Mother had housing with beds for the children, but little or no other furniture; and that conditions in the home had begun to deteriorate. Amended Motion and Affidavit for Commitment to the Permanent Custody of MCCS (Mar. 2, 2021), p. 2.

{¶ 17} On April 15, 2021, Mother filed a motion to reunify with protective supervision, asserting that she had been working her case plan and was ready to reunify. Subsequently, Mother filed a motion on May 11, 2021, asking that the permanent custody trial be continued due to Mother's identification of a potential father for Patrick and a possible placement option for the children. MCCS opposed the motion, indicating that it had spoken with the potential father, who had had no knowledge of the child until earlier that month, and he was also not a viable placement option. MCCS further said it had contacted the other person Mother had named and that person was not interested in being a placement option. A GAL report filed on May 12, 2021, again recommended that the court grant permanent custody of all the children to MCCS. GAL Report to the Court

(May 12, 2020), p. 13.

{¶ 18} The custody hearing took place as scheduled on May 19, 2021, and was continued to August 6, 2021. A further GAL report filed on July 30, 2021, again recommended that MCCS receive permanent custody of all the children. GAL Report to the Court (July 30, 2021), p. 8.

{¶ 19} The August 6, 2021 hearing also took place as scheduled, and the matter was continued to September 27, 2021, due to an unforeseen emergency of Mother's counsel. After this September hearing, the magistrate entered an interim order providing that the four older children should have parenting time in Mother's home for four hours per week, transition to eight hours per week, and then transition to overnight parenting time. Patrick was not included in this order. The magistrate further noted that she would reevaluate the parenting time at a November 12, 2021 pretrial. The final hearing was also continued to December 13, 2021. Magistrate's Interim Order (Sept. 28, 2021), p. 2.

{¶ 20} On November 12, 2021, the GAL filed an updated report concerning Mother's potential reunification with the eldest four children. The GAL noted that while MCCS was working very hard to reunify the children with Mother, Mother had missed three consecutive weeks of Monday night visits with the children. Updated GAL Report to the Court (Nov. 12, 2021), p. 2. The GAL further stated that Mother was working third shift at a job and did not have a daycare plan for working nights. *Id.* at p. 2-3. The GAL again recommended that MCCS be granted permanent custody. Alternatively, if any children were reunified, the GAL recommended that MCCS be given 12-months

protective supervision and that MCCS assist Mother in exploring childcare options and enrolling the children in school.  *Id.* at p. 3.   At the final pretrial, the magistrate ordered that parenting time under the prior order remain in effect and that the parties should continue to discuss a resolution.   Magistrate's Interim Order (Nov. 12, 2021), p. 2.

{¶ 21} On December 1, 2021, MCCS filed another SAR, indicating that a review had taken place on November 9, 2021.   The review stated that MCCS was "not in agreement with the in-home visitation order due to mother's inconsistency with addressing her own mental health issues, substance use issues, being non-compliant with probation, and inconsistency with supervised weekly visitation scheduled at the agency."   SAR (filed on Dec. 1, 2021), p. 2.   According to the review, T.S., Sr. (the "paramour") was the father of Mother's sixth child, T.S., Jr., who had been born in January 2020.   T.S. Sr. had agreed in court to give legal custody of this child to the paternal grandmother as of April 3, 2021.   Since that time, T.S., Sr. had been incarcerated for a probation violation.   *Id.* at p. 8.   The SAR further stated that:

> Mother is not capable of supervising her children for long periods of time as she struggles to manage all of her children during scheduled visitations at the agency.   She has a history of making negative decisions and choices that place her children at risk and in unsafe situations.   [Mother] has an alleged friend/paramour, [X.C.] who was charged with child endangering with serious bodily harm to his own two-year old child in August 2021.   The agency recommends permanent custody of mother's children within the next 180 days.   Mother tested positive for Marijuana as of 11/9/2021.

Mother needs to demonstrate the protective capacities to meet all of her children's needs [for] food, shelter, clothing, academics, medical, dental and adequate supervision for an extended period of time. Mother did not attend any medical visits for her children while in agency care.

SAR at p. 9.

{¶ 22} On December 7, 2021, the GAL filed an updated report with the court and stated that she would reserve her recommendation until the final hearing was completed. The GAL noted concern over the fact that something happened to the children (a burn and the children administering their own medication) during the first two home visits with Mother. Updated GAL Report to the Court (Dec. 7, 2021), p. 5. The GAL further stated that Mother did not have a day-care plan or schedule upon reunification, that Mother had missed her Dec. 6, 2021 visitation with the children for the fourth time in four months, and that Mother still admitted she was regularly using marijuana. *Id.* at p. 4.

{¶ 23} The final custody hearing was held on December 13, 2021. On December 21, 2021, MCCS filed a motion to amend or suspend mother's visitation. On January 6, 2022, the magistrate filed a decision denying MCCS's permanent custody motion. The magistrate concluded that reunification of the children should occur, with protective supervision granted to MCCS for six months. The magistrate also denied MCCS's motion to suspend visitation. Magistrate's Decision and Judge's Order (Jan. 6, 2022), p. 3 and 8-9.

{¶ 24} On January 7, 2022, MCCS filed initial objections to the magistrate's decision, requested leave to file supplemental objections after hearing transcripts were

filed, and requested preparation of transcripts. In late January 2020, MCCS filed another motion to amend or suspend new visitation. The motion was based on Mother's December 13, 2021 arrest and detention until December 22, 2021, based on a probation violation and Mother's failure to have the children on overnight visits since December 10, 2021. Motion and Memorandum in Support to Amend/Suspend Visitation (Jan. 20, 2022), p. 2-3. Mother had also been placed on stipulations for weekly visits due to failures to appear. *Id.* at p. 3. The magistrate denied this motion and ordered that the September 2021 parenting times remain in effect.

{¶ 25} On May 31, 2022, MCCS filed a motion to reopen the testimony and for a hearing. According to the motion, Mother had not had any in-person visits with her children since January 10, 2022; Mother had not had phone or video contact with Patrick for over a year; and Mother had not had phone contact with the four other children since February 18, 2022. MCCS therefore alleged that Mother had abandoned the children. MCCS Motion to Reopen Testimony and Request for Hearing (May 31, 2022), p. 2.

{¶ 26} On June 17, 2022, the GAL filed a motion to suspend Mother's in-home visitation. The GAL stated that Mother had not visited Patrick for 147 days and that Mother's first visit with the children in more than 100 days had occurred on June 6, 2022. Motion to Suspend Mother's In-Home Visitation (June 17, 2022), p. 2-3. The GAL also expressed concern for the children's safety when in Mother's home because Mother was dating K.M., who had been charged with robbery and rape in 2020 and was facing a charge of having weapons under disability. *Id.* at p. 3. The GAL further said that while Mother had denied dating K.M., K.M. had answered the door when a caseworker visited

Mother's home. In addition, the GAL stated that Mother did not have adequate food in the house. *Id.*

{¶ 27} The court granted MCCS's motion to add testimony and set an August 16, 2022 hearing on that matter and the GAL's motion to suspend in-home visitation. The court then continued the matter until September 27, 2022. On the day before that hearing, the GAL filed a supplemental report stating that Mother was living with the maternal grandmother in a three-bedroom house along with the grandmother's son and daughter. According to the GAL, another adult daughter also appeared to be living there with her two children. Supplemental GAL Report to the Court (Sept. 26, 2022), p. 2. The GAL further said that Mother had visited with the children three times at the Haines Center since January 6, 2022, and in-home visits had been suspended as a result of the missed visits. *Id.* at p. 1. The GAL recommended that the children stay in the custody of MCCS. *Id.* at p. 4.

{¶ 28} The September 27, 2022 hearing was held before the juvenile judge, not a magistrate. After the hearing, the judge suspended Mother's in-home parenting time. The judge also allowed Mother's weekly visitation at the agency to remain in effect until further court order. Judge's Order (Sept. 28, 2022), p. 2.

{¶ 29} On November 17, 2022, MCCS filed its supplemental objections to the magistrate's decision. Mother then filed her response to the objections on December 16, 2022. The judge's final appealable order was filed on December 27, 2022; it sustained MCCS's objections and granted permanent custody of all five children to MCCS. The court found that the children had been in the custody of MCCS for 21 consecutive months,

which exceeded the requirements of R.C. 2151.414(B)(1(d). The court also held that granting permanent custody to MCCS was in the children's best interest. Judge's Final Appealable Order ("Final Judgment"), p. 3 and 17. Mother timely appealed from the judge's decision on January 26, 2023.

II. Alleged Abuse of Discretion in Granting MCCS Permanent Custody

{¶ 30} Mother's sole assignment of error states that:

The Juvenile Court Abused Its Discretion When It Granted Permanent Custody of the Children to MCCS.

{¶ 31} Under this assignment of error, Mother contends that she had completed all her case plan objectives. Mother also points to her own testimony that she was in a position to reunify with the children and that reunification was in their best interest. In addition, Mother claims the trial court abused its discretion in sustaining MCCS's objections because the judge heard only an abbreviated amount of testimony while the magistrate's hearings were of greater length.

{¶ 32} Before considering Mother's arguments, we will outline the standards that apply to termination of parental rights.

A. Applicable Standards for Terminating Parental Rights

{¶ 33} "The United States Supreme Court has stated that parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty

interests recognized by this Court.' " *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Ohio has also held that "parents who are 'suitable' have a 'paramount' right to the custody of their children." *Id.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). However, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App.1974). "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *B.C.* at ¶ 20.

{¶ 34} Here, MCCS's permanent custody motions were brought pursuant to R.C. 2151.413, R.C. 2151.414(B)(1)(a), and R.C. 2151.414(E)(1), (2), (3), (4), (14), (15), and (16). Amended Permanent Custody Motion (Mar. 2, 2021), at p. 1. As noted, the motion to reopen also alleged that Mother had abandoned the children.

{¶ 35} As relevant here, R.C. 2151.413(D)(1) provides that "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child." The purpose of the "12 of 22" requirement is to "balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 22.

{¶ 36} There is no dispute that all five children were in MCCS's custody for the

pertinent period of time. While earlier dependency adjudications occurred in 2012, 2014, 2015, and 2016, the latest grant of temporary custody of the four eldest children (Patty, Peter, Pam, and Penny) occurred on May 6, 2019, after their most recent removal from Mother. The youngest child, Patrick, was adjudicated dependent and was placed in MCCS's custody on May 28, 2019, shortly after his birth. The children all remained in MCCS's custody after that date. Transcript of Proceedings ("Tr."), p. 289-290. Thus, when the amended motion for custody was filed on March 2, 2021, the children had been in the agency's custody for 21 consecutive months. The judge relied on this ground in granting permanent custody. Final Judgment at p. 3. Mother has not challenged this finding.

{¶ 37} In such situations, "the agency still must prove by clear and convincing evidence, that it is in the child's best interest to grant permanent custody to the agency." *In re N.M.P.*, 160 Ohio St.3d 472, 2020-Ohio-1458, 159 N.E.3d 241, ¶ 26, citing R.C. 2151.414(B)(1). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 38} To decide a child's best interest, courts analyze factors set forth in R.C. 2151.414(D)(1)(a)-(e) and (E). These include, but are not limited to: "(1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any

other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15, citing R.C. 2151.414(D).

**{¶ 39}** We will not overturn a juvenile court's decision to terminate parental rights "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re Forrest S.*, 102 Ohio App.3d 338, 344-345, 657 N.E.2d 307 (6th Dist.1995). "We review the trial court's judgment for an abuse of discretion." *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (which applied an abuse of discretion standard to the trial court's findings under R.C. 2151.414).

**{¶ 40}** " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), quoting *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable," rather than "unconscionable or arbitrary." *Id.*

{¶ 41} Furthermore, "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Specifically, since "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." *Id.* However, the court's discretion, while broad, is "not absolute" and is guided by statutory language. *Id.*

## B. The Children's Best Interest

{¶ 42} In concluding that granting permanent custody to MCCS was in the children's best interest, the juvenile judge discussed each factor in R.C. 2151.414(D)(1)(a)-(d) in detail and also stated that he had considered R.C. 2151.414 (E)(7)-(11). "The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 19. The particular factor found here was that Mother had

abandoned the children for purposes of R.C. 2151.414(E)(10).   Final Judgment at p. 3.

**{¶ 43}** The Supreme Court of Ohio has said that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e).   Consideration is all the statute requires."   *A.M.* at ¶ 31. Nonetheless, the Supreme Court strongly encouraged discussion, stressing that "the best practice is for the juvenile court to specifically address each factor."   *Id.* at ¶ 32.

**{¶ 44}** Before we review the court's findings, we note that we disagree with Mother's assertion that the juvenile judge lacked a proper basis for sustaining MCCS's objections simply because he had less opportunity to view the witnesses.   "In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law."   Juv.R. 40(D)(4)(d).   "The independent review requires the trial court to conduct a de novo review of the facts and an independent analysis of the issues to reach its own conclusions about the issues in the case."   *In re G.H.*, 2023-Ohio-295, 207 N.E.3d 67, ¶ 43 (6th Dist.), citing *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 42 (6th Dist.), citing *Barker v. Barker*, 6th Dist. Lucas No. L-00-1346, 2001 WL 477267, *3 (May 4, 2001).   "Thus, despite a magistrate's findings, the trial court must reevaluate the evidence presented at a hearing."   *Barker* at *3 (referencing a trial court's review of a magistrate's decision under Civ.R. 53).

**{¶ 45}** Juv.R. 40(D)(4)(b) and (d) also allow the court to hear additional testimony. " 'Juv.R. 40 contemplates that new events may arise or be discovered between the time of a magistrate's decision and a trial judge's final judgment, and the rule provides a

mechanism for the introduction of such evidence in a timely manner.' " *In re Z.C.*, 2d Dist. Montgomery No. 29616, 2023-Ohio-963, ¶ 26, quoting *In re A.S.*, 9th Dist. Summit No. 26462, 2013-Ohio-1975, ¶ 14. This was done here, based on matters that arose after the magistrate's last hearing on December 13, 2021. As a result, the judge heard evidence the magistrate did not have. The added evidence was very damaging to Mother's case.

{¶ 46} During the May 19, 2021 custody hearing, the magistrate heard testimony from: (1) Dr. Bromberg, who conducted a psychological assessment of Mother in August 2019; (2) Parthina Christon, a comprehensive dual recovery ("CDR") therapist who saw Mother beginning in August 2019; and (3) Foster Mother 2 ("FM2"), who had fostered Patrick since he was two days old. During the September 27, 2021 custody hearing, the magistrate took testimony from: (1) FM2; (2) Foster Mother 1 ("FM1"), who had fostered the four older children since July 2019; (3) Beth Pfoutz, the MCCS caseworker for Mother from November 2015 until late August 2021; and (4) Quinnan Howard, program coordinator for the Montgomery County Office of Reentry.

{¶ 47} During the December 13, 2021 custody hearing, the magistrate heard testimony from: (1) T.F., Mother's twin sister; (2) Lisa Brock, Mother's MCCS caseworker since October 2021; and (3) Mother. Finally, on September 27, 2022, the judge heard testimony from: (1) FM2; and (2) Lisa Brock. Mother did not appear for this hearing.

{¶ 48} With this information in mind, we will review the juvenile judge's decision.

1. The Children's Relationships

{¶ 49} R.C. 2151.414(D)(1)(a) involves consideration of "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." The court discussed these relationships at length. *See* Final Judgment at p. 4-8.

{¶ 50} The court noted Mother's claim that returning the children to her would be "healing" and Mother's assertion that she loved the children dearly. *Id.* at p. 4. The court went on to discuss Patrick, who was born in 2019 and had been in the same foster home since birth. In this regard, the court noted Patrick's problems with eating and gaining weight; Patrick's diagnoses of fetal alcohol syndrome and attention deficit hyperactivity disorder (ADHD); the more than 100 doctors' appointments Patrick had had in his short life; Mother's failure to attend any appointments despite having had notice; the lack of a bond between Mother and Patrick; the fact that Patrick was thriving in FM2's home; Patrick's bond with FM2's family; FM2's desire to adopt Patrick; Mother's failure to have phone or virtual contact with Patrick from December 13, 2021 to September 27, 2022; Mother's failure to exercise visitation with Patrick between January 10, 2022 and June 6, 2022; and the fact that Mother had only visited Patrick on three occasions between December 31, 2021 and September 27, 2022, with the last visit having occurred on June 13, 2022. *Id.* at p. 4-5 and 8.

{¶ 51} Having reviewed the evidence, including the hearing transcripts, we find competent, credible evidence to support these findings. *See* Tr. at 164-240 (testimony of FM2); at 286-361 (testimony of caseworker Pfoutz); and at 410-436 (testimony of caseworker Brock); and Transcript of Proceedings (Sept. 27, 2022) ("Tr. 2"), 21-22, 25,

26-27, and 31 (testimony of FM2); and 36-59 (testimony of Brock).

**{¶ 52}** Regarding the other four children, the court noted the following facts: the children were all doing fine in their current placement, where they had been since July 2019; they were all on medication, but Mother had never asked about it; Mother did not visit Peter when he was hospitalized for two days even though she had been notified; FM1 had always made the children available by phone to Mother, but Mother did not often call them; Mother had difficulty handling all the children, and they had been out of control at visitation; the children were bonded to FM1 and her husband, who were also bonded to the children; and the children were bonded to each other. Final Judgment at p. 5-8.

**{¶ 53}** As with Patrick, the court noted that Mother had not exercised visitation with these four children between January 10, 2022, and June 6, 2022; Mother saw them only three times between December 13, 2021, and September 27, 2022, with the last visit having been on June 13, 2022; and Mother had last spoken with these children on February 18, 2022. *Id.* at p. 8.

**{¶ 54}** Again, our review of the record, including the transcripts, reveals competent, credible evidence to support the court's findings. *See* Tr. at 243-284 (testimony of FM1); at 268-361 (Pfoutz testimony); and at 410-436 (Brock testimony); and Tr. 2 at 36-59 (Brock testimony).

### 2.   The Children's Wishes

**{¶ 55}** R.C. 2151.414(D)(1)(b) requires consideration of "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard

for the maturity of the child." In this regard, the court noted that the four older children wanted to return home to Mother and that Patrick was too young to express his wishes. Final Judgment at p. 8. This observation is supported by the evidence in the record. *See* Tr. at 476-477.

### 3. Custodial History

{¶ 56} R.C. 2151.414(D)(1)(c) involves "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *." In this regard, the court discussed the custodial history, beginning with the fact that Mother was removed from her own home as a child and had three children while still in MCCS's care. Final Judgment at p. 9. The court related other history, including: MCCS's removal of the children in 2016 when Mother had left the children with the maternal grandmother; reunification of the four older children with Mother in 2018; the removal of the children again in 2019 and assumption of custody when Mother was arrested for having a firearm in her vehicle without a permit; and MCCS's removal of Patrick in 2019 based on allegations of physical abuse due to exposure to substances and Mother's inability to provide for him. *Id.* The court's findings were supported by competent, credible evidence. *See* Tr. at 287-289.

### 4. Need for Legally Secure Placement

{¶ 57} R.C. 2151.414(D)(1)(d) requires consideration of "[t]he child's need for a

legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." Regarding this point, the court discussed the case plan at length. Final Judgment at p. 9-16. The court found that Father's case plan was incomplete as he had not visited with the children since 2019 and had had no contact with the caseworker for a year and a half before September 27, 2021. *Id.* at p. 9. The court's finding was supported by competent, credible evidence. *See* Tr. at 338 and Tr. 2 at 52. In fact, Father did not appear at any of the hearings, and Father's attorney said he had had no contact with Father since January 2020 and had not been able to reach Father. Tr. 2 at 8.

{¶ 58} Concerning Mother, the court noted caseworker testimony that: Mother did not comply with the case plan's substance abuse requirements, which was a barrier to reunification; MCCS had ongoing concern over Mother's alcohol use, which Mother failed to report to her therapist; Mother had been discharged from treatment at South Community Incorporated ("SC") in October 2021 and failed to provide a reason for the discharge; Mother had a long history of domestic violence in dating relationships and, while Mother had completed treatment around July or July 2021, MCCS had ongoing concerns because Mother continued to engage with her abuser and often initiated contact; Mother's income stability was a concern during the case; and Mother's mental health and substance use were "concerning barriers for reunification." Final Judgment at p. 10, 13, 14 and 16. Again, competent, credible evidence supported these findings. *See* Tr. at 289, 302-304, 308-309, 310, 315, 323-326, and 328.

{¶ 59} The court also discussed Dr. Bromberg's testimony in detail. Final

Judgment at p. 10-12. Dr. Bromberg had conducted a psychological and parenting assessment of Mother through a clinical interview and psychological testing in August 2019. Tr. at 9-10. Based on his evaluation and testing, Dr. Bromberg diagnosed Mother with severe substance abuse disorder, a mood disorder, a chronic complicated personality disorder with features of multiple personality disorders, and impulse control problems. *Id.* at 44-47. Bromberg concluded, based on these four disorders, that Mother was "beyond seriously extremely psychologically impaired." *Id.* at 48.

{¶ 60} Dr. Bromberg made several recommendations, including random drug testing for at least 24 months; dialectical behavior therapy ("DBT") or cognitive behavior therapy ("CBT") once a week in a group setting for 24 months at least; individual DBT or CBT at the same time for at least 24 months; extensive anger management treatment for at least eight months; parenting skills training on a weekly basis for at least a year; and Artemis programming. *Id.* at 51-53. According to Bromberg, if Mother failed to follow through with all these treatment recommendations, placing the children in her care would post a great risk of harm. *Id.* at 54.

{¶ 61} Mother initially went to SC in April 2019, before she was evaluated by Dr. Bromberg. Mother was assessed there on April 11, 2019, but failed to appear for seven appointments after that. As a result, SC sent Mother a termination letter on August 9, 2019. Mother then reengaged in August 2019 and began working that month with Parthina Christon, a CDR therapist. Christon relied on the April 11, 2019 SC assessment for her diagnosis. Mother never told Christon about Dr. Bromberg's treatment recommendations, nor was Christon ever shown Dr. Bromberg's report. Tr. at 102, 115,

119, 138, 139, and 144. According to Christon, the initial treatment goals were to manage the symptoms of depression and to be able to decrease the impact of substance abuse, i.e., for Mother to go without substances for seven days per week. *Id.* at 104 and 106.

**{¶ 62}** In August 2020, SC reviewed the treatment plan. At that time, Mother reported she had not had any substance abuse in the last six months. *Id.* at 107. As a result, substance abuse was not the primary goal of the therapy appointments anymore. *Id.* at 108. Furthermore, SC never did any drug screens of Mother, as SC was a "nonintensive outpatient program" and did "not rely on drug screens." *Id.* at 139. Although Christon was aware Mother had a history of domestic violence, the topic never came up in their therapy sessions between August 2019 and May 2021. *Id.* at 160-161.

**{¶ 63}** Out of 40 appointments scheduled with SC, Mother attended 24; the 16 cancelations (seven of which occurred before Christon began working with Mother) occurred due to "no shows" or Mother's cancellation of the appointment. *Id.* at 110-111. A second termination letter was sent to Mother on January 18, 2021, after Mother missed three appointments. *Id.* at 115 and 148-149. Mother responded and was scheduled in February 2021. Mother had not missed any appointments between then and the May 19, 2021 custody hearing. *Id.* at 150-151. As indicated, SC later discharged Mother from treatment in October 2021; Mother did not reengage or did she attempt to go elsewhere. *Id.* at 412.

**{¶ 64}** In light of the above discussion, it is clear that Mother did not complete substance abuse and mental health treatment, and the court's statements were supported

by competent, credible evidence. As to visitation, while Mother had visited consistently during parts of the case, she was inconsistent at other times and failed to visit or maintain any contact with the children for most of a year. Accordingly, Mother failed to meet this requirement as well.

{¶ 65} Given the length of the children's history in MCCS's custody and Mother's repeated failure to maintain stability in her life and to rectify the conditions causing the children's removal, there is no doubt that a legally secure placement for the children could not have been achieved without granting permanent custody to MCCS.

### 5. Application of Remaining Factors

{¶ 66} The final consideration is "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)(e). The juvenile court concluded that R.C. 2151.414(E)(10) applied, which is that "[t]he parent has abandoned the child." *See* Final Judgment at p. 17. The court found clear and convincing evidence of abandonment based on evidence presented at the September 27, 2022 hearing. According to the court, this evidence demonstrated that Mother had failed to visit or maintain contact with the children for more than 90 days and had abandoned the children. *Id.*

{¶ 67} R.C. 2151.011(C) states that for purposes of R.C. Chap. 2151, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." This presumption is rebuttable.

*In re N.C.*, 2d Dist. Montgomery No. 28105, 2019-Ohio-567, ¶ 69, citing *In re Custody of C.E.*, 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, ¶ 17.

**{¶ 68}** As indicated above, Mother failed to visit or contact Patrick for more than 90 days on two occasions: from January 10, 2022, to June 6, 2022, and from June 13, 2022 through September 27, 2022 (the day of the last hearing). Mother also failed to visit the other children from January 10, 2022 to June 6, 2022, and contacted them only on February 18, 2022. The period from February 18, 2022 to June 6, 2022, was more than 90 days. In addition, Mother failed to visit or contact these children from June 13, 2022, through September 27, 2022, another period of more than 90 days.

**{¶ 69}** Mother did not appear at the September 27, 2022 hearing, so there was no evidence to rebut the presumption that she had abandoned all the children. Mother's attorney stated that she had last heard from Mother on July 29, 2022, and that Mother had said she would be at the hearing and would bring witnesses. Tr. 2 at 7. After that time, however, Mother had not responded to her attorney's attempts to reach her, and the attorney had no explanation for Mother's failure to appear. *Id.*

**{¶ 70}** Mother's caseworker, Lisa Brock, made multiple efforts to contact Mother about visitation between December 30, 2021 and September 22, 2022, including making phone calls, appearing at the visitation center when Mother was scheduled to visit (but did not appear), attempting to schedule home visits, and making unscheduled home visits. On the few occasions when Brock was able to successfully reach Mother, she reminded Mother about visitation. The only time Brock's efforts resulted in Mother's actually visiting the children was after an unannounced home visit on May 27, 2022.

Mother thereafter visited the children at the agency on June 6 and June 13, 2022. Mother made no further attempts to see or contact the children. *Id.* at 36, 38, 39, 41-42, 44-45, 47-48, and 49-50. Accordingly, the presumption of abandonment was not rebutted, and the trial court's finding on abandonment was supported by competent, credible evidence.

{¶ 71} Based on the preceding discussion, the trial court did not abuse its discretion by terminating Mother's parental rights and awarding permanent custody of the five children to MCCS. Mother's assignment of error is overruled.

### III. Conclusion

{¶ 72} Mother's sole assignment of error having been overruled, the judgments of the juvenile court are affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.