[Cite as *In re L.S.F.*, 2024-Ohio-3033.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: L.S.F. | : | |
| | : | |
| | : | C.A. No. 2023-CA-44 |
| | : | |
| | : | Trial Court Case No. 2021-C-00038 |
| | : | |
| | : | (Appeal from Common Pleas Court- |
| | : | Juvenile Division) |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 9, 2024

. . . . . . . . . . .

RICHARD L. KAPLAN, Attorney for Appellant

DAVID D. HAYES, Greene County Prosecutor, by MEGAN A. HAMMOND, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant Mother appeals from a juvenile court judgment terminating her parental rights and granting permanent custody of her minor child, L.S.F., to Appellee, Greene County Children Services ("GCCS"). The child's father did not appeal.

{¶ 2} In support of her appeal, Mother contends the juvenile court's decision was based on insufficient evidence and was against the manifest weight of the evidence. After reviewing the record, we disagree, as ample evidence supported the decision. Accordingly, Mother's sole assignment of error will be overruled, and the judgment of the trial court will be affirmed.

I.  Facts and Course of Proceedings

{¶ 3} On April 6, 2021, GCCS filed a complaint in juvenile court alleging that L.S.F., who was then two years old, was a neglected child as defined in R.C. 2151.03(A)(2) and a dependent child as defined in R.C. 2151.04(B) and (C).[1]  L.S.F. was the child of Mother and Father, whose residence was unknown.

{¶ 4} According to the complaint, GCCS received a referral on March 5, 2021, which stated that a search warrant had been executed at the apartment of J.W., who was not related to either Mother or L.S.F.  During the search, police officers found loaded syringes, methamphetamine ("meth"), pipes, scales, and other drug paraphernalia within L.S.F.'s reach.  Complaint at p. 3.  L.S.F.'s grandfather ("Grandfather") had picked up L.S.F., and the child was then residing with him.  *Id.*

{¶ 5} The complaint further alleged that at a March 12, 2021 drug assessment, Mother testified positive for meth, amphetamines, THC, and Suboxone (which had not been prescribed).  Mother also completed a drug screen for GCCS to determine levels, and the results were positive for extremely high levels of meth, amphetamines, and THC.

---

[1] Incorrect initials (L.D.) were initially used for L.S.F. but were later corrected.  To avoid confusion, we will use the latter set of initials.

Mother again tested positive on March 19, 2021, for THC and for Suboxone, which had not been prescribed. In another drug screen on March 26, 2021, Mother again tested positive for meth, amphetamines, and THC. *Id.* The complaint further noted that another drug test was pending and that Mother had been through several treatment programs, including an inpatient program. *Id.* Due to substance abuse concerns, GCCS asked the court to give Grandfather temporary custody with protective supervision or, alternatively, to give temporary custody to GCCS. *Id.* at p. 4.

{¶ 6} On April 12, 2021, the court appointed a guardian ad litem ("GAL") for L.S.F. GCCS then filed a family case plan, which outlined steps for Mother to: "engage in AOD services as assessed"; "submit to drug screens through the agency on request"; "sign releases of information as needed"; "engage in parenting classes"; "maintain safe and stable housing, free of hazards"; and visit regularly with the child, during which Mother would "parent safely and responsibly." Family Case Plan (Apr. 27, 2021), p. 2. At the time, Grandfather was on the plan, as he was taking care of the child.

{¶ 7} Following a hearing at which Mother stipulated that L.S.F. was neglected and dependent, a magistrate granted temporary interim custody to GCCS, found that L.S.F. could not be placed with Mother due to her substance abuse issues, and found that the child could not be placed with Father because his whereabouts were unknown. The court then scheduled a dispositional hearing for June 2, 2021.

{¶ 8} Because Grandfather notified GCCS that he could no longer care for L.S.F., the agency filed an updated case plan on May 6, stating that it had placed the child in foster care. Due to Mother's substance abuse issues, visits between Mother and L.S.F.

were supervised and were scheduled once a week for two hours at the Visitation Center. Updated Case Plan (May 6, 2021), p. 4. A GAL report filed in late May indicated that Mother was complying with the case plan, including signing releases, supporting the child financially, following mental health and drug recommendations, and submitting to drug screens. Mother also had received a certification of completion for parenting classes. GAL Report (May 25, 2021), p. 2. At that time, Mother was in acceptable housing but had been informed the landlord would no longer accept vouchers. Consequently, Mother had to look for housing. Mother told the GAL that she had tested positive on a March 30 drug screen but had been negative every week since. Mother was also progressing well in other areas like visitation; the GAL recommended that temporary custody remain with GCCS, but that Mother's visitation be increased to two hours twice a week. *Id.* at p. 3-5.

{¶ 9} After the June 2 hearing, the magistrate found that Mother had substance abuse problems and had begun services. Specifically, in April, Mother had tested positive for meth, and in May she had tested positive only for THC. The magistrate found GCCS had made reasonable efforts to prevent the child's removal and to make it possible for her to come home. The magistrate then concluded that granting temporary custody to GCCS was in the child's best interest. Magistrate's Decision (June 2, 2021), p. 1-2.

{¶ 10} In February 2022, GCCS filed a motion to extend temporary custody. At that time, Mother was living with Grandfather, had been engaged in substance abuse services, and had been visiting L.S.F. with "fair consistency and interacting with her appropriately the majority of the time." Motion to Extend Temporary Commitment (Feb. 23, 2022), p. 1. The motion noted that Mother was required to maintain her sobriety for

a significant period of time, to remain in treatment that her provider recommended, to obtain and maintain stable housing, and to demonstrate age-appropriate and positive parenting when visiting with L.S.F.

{¶ 11} Subsequently, the GAL filed another report, again recommending that GCCS retain temporary custody. While Mother had obtained a job, she had tested positive on two drug tests and needed to work on obtaining housing. GAL Report (Mar. 11, 2022), p. 5-6. The GAL remarked that "[i]t is of the utmost importance [Mother] remain drug free." *Id.* at p. 6. At the time of the temporary custody hearing in March 2021, Mother was "incarcerated due to obstruction and a previous warrant for a traffic violation." Magistrate's Decision (Mar. 21, 2022), p. 1. The magistrate granted a first extension of temporary custody to GCCS, finding L.S.F. could not be placed with Mother due to her "incarceration, substance abuse, and lack of safe and stable housing." *Id.* at p. 2. Father was also incarcerated. *Id.*

{¶ 12} In August 2022, GCCS requested a second extension of temporary custody, noting that Mother had continued to engage in substance abuse services and had progressed to unsupervised visitation. However, Mother needed to accomplish the following matters: obtain and maintain safe and stable housing; maintain sobriety for a significant period of time; provide a relapse plan to ensure the home's safety was not compromised; and demonstrate appropriate parenting. Motion to Extend Temporary Commitment (Aug. 22, 2022), p. 1. The GAL then filed a report recommending that GCCS retain temporary custody. In this regard, the GAL noted that while Mother's drug screens were negative at that time, she had not secured safe and stable permanent

housing, and L.S.F. was being treated with speech, occupational, and behavioral therapy. The GAL stressed it was imperative for Mother to make herself available to attend these appointments, which were held with three specialists every week and would be on a long-term basis. Further imperatives were for Mother to engage with the staff and teachers at L.S.F.'s preschool and to obtain safe and stable housing. GAL Report (Sept. 8, 2022), p. 5-7.

{¶ 13} After considering the matter, the magistrate granted a second extension of temporary custody, finding the child could not be placed with Mother due to her lack of safe and stable housing and could not be placed with Father due to his incarceration. Magistrate's Decision (Sept. 19. 2022), p. 2. On February 10, 2023, GCCS filed a motion seeking modification of temporary custody to permanent custody, citing Mother's inability to meet L.S.F.'s special needs and to provide safe care. A hearing was then scheduled for March 6, 2023. Before the hearing, the GAL filed a report recommending that L.S.F. remain in GCCS's temporary custody and that GCCS file for permanent custody. GAL Report (Feb. 23, 2023), p. 4. The GAL noted many concerns, including: Mother's failure to meet or interact with L.S.F.'s teacher; Mother's infrequent attendance at L.S.F.'s therapy sessions and dental/medical appointments; L.S.F.'s prior diagnosis of PTSD; L.S.F.'s statement that she wanted to live with her foster family; Mother's failure to obtain appropriate housing; Mother's positive drug screen for meth and amphetamines; Mother's conviction for driving with "no operator's license"; and the fact that Mother had lived at five different residences and had been employed by five different companies during the nearly two years the GAL had been involved with the case. *Id.* at p. 1-4.

{¶ 14} On March 3, 2023, the court rescheduled the permanent custody hearing for May 30, 2023, and appointed attorneys for both Mother and Father. Shortly thereafter, the magistrate found it was in L.S.F.'s best interest to remain in GCCS's temporary custody until a permanent custody decision was made. Magistrate's Decision (Mar. 6, 2023). The trial court adopted the decision the same day, and no objections were filed.

{¶ 15} On March 14, 2023, the GAL filed a preliminary report recommending that GCCS be granted permanent custody. The GAL also said a more detailed investigative report would follow. At GCCS's request, the permanent custody hearing was rescheduled to May 16, 2023. Mother then filed a motion on May 5, 2023, asking the court to grant legal custody to either Grandfather or another individual, R.G. (who was described as a family friend).

{¶ 16} The permanent custody hearing was held on May 16, 2023, as scheduled. During the hearing, GCCS presented testimony from the following individuals: Jerome Pete Reed, a certified forensic scientist employed by Forensic Fluids Laboratories; L.S.F.'s foster mother, Amanda, who was a licensed foster care parent; Elizabeth, a GCCS case aide who began transporting L.S.F. for visits with Mother in January 2023; and Michelle, an ongoing GCCS supervisor who had been involved with the case since April 2021, when it was transferred from intake. Transcript ("Tr.") (May 16, 2023), 6, 19-20, 39-40, 60, 64-65, and 84-85.

{¶ 17} Mother was present for the hearing and was represented by counsel. However, Mother withdrew her legal custody motion and also said she did not wish to

testify. In addition, Mother did not present any witnesses. *Id.* at 216. Father did not appear for the hearing, and his appointed attorney related various unsuccessful attempts to reach him. *Id.* at 4-5. During the hearing, the court also admitted State's Exhibits 6, 7, and 8 (GCCS Case Plans); State's Exhibits 9-14 (CASA Reports); and State's Exhibits 15-35 (Toxicology Reports for Mother). *Id.* at 36, 211, and 213.

{¶ 18} After the hearing, the court filed a decision awarding permanent custody to GCCS. *See* Judgment Entry & Order of Permanent Custody ("Order") (July 20, 2023). Mother then timely appealed from the judgment.

## II. Sufficiency and Manifest Weight Discussion

{¶ 19} Mother's sole assignment of error states that:

The Trial Court's Decision Terminating [Mother's] Parental Rights Was Against the Sufficiency of the Evidence and the Manifest Weight of the Evidence.

{¶ 20} Mother challenges the trial court's conclusion that her use of controlled substances placed L.S.F. in danger. According to Mother, there was no evidence upon which the court could infer that her drug use endangered L.S.F. Before we address Mother's argument, we will outline the applicable review standards.

## A. Standards of Review

{¶ 21} The standards that apply in reviewing decisions on permanent custody of children and termination of parental rights are sufficiency of the evidence and manifest

weight of the evidence. *In re Z.C.*, 2023-Ohio-4703, ¶ 1. Sufficiency arguments test for adequacy and involve questions of law. *Id.* at ¶ 13. In that situation, appellate courts should affirm a judgment where legally sufficient evidence exists to support the judgment as a matter of law. *Id.*, citing *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, and *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 22} " 'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a [judgment] is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' " *In re Adoption of L.B.R.*, 2019-Ohio-3001, ¶ 19 (2d Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). "As a result, 'a determination that a [judgment] is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *Id.*, quoting *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

{¶ 23} "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21. " 'The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the

proffered testimony.' " *Z.C.* at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). " ' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." ' " *Id.*, quoting *Seasons Coal* at 80, fn. 3. (Other citation omitted.)

{¶ 24} With these standards in mind, we will consider Mother's claims and the trial court's decision.

## B. Discussion

{¶ 25} As pertinent here, R.C. 2151.413(D)(1) provides that "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child." The "12 of 22" requirement is intended to "balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child." *In re C.W,* 2004-Ohio-6411, ¶ 22. This requirement was satisfied here, and there is no claim otherwise.

{¶ 26} Even where the statutory time period is satisfied, "the agency still must prove by clear and convincing evidence, that it is in the child's best interest to grant permanent custody to the agency." *In re N.M.P.*, 2020-Ohio-1458, ¶ 26, citing R.C. 2151.414(B)(1). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such

certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. " 'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.' " *Z.C.*, 2023-Ohio-4703, at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

{¶ 27} To decide a child's best interest, courts analyze factors set forth in R.C. 2151.414(D)(1)(a)-(e). These include, but are not limited to: (a) the child's interaction and relationship "with the child's parents, relatives, foster parents and any other person who may significantly affect the child"; (b) the child's wishes; (c) the child's custodial history, "including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period"; (d) "the child's need for a legally secure permanent placement" and if it can be achieved without granting the agency permanent custody; and (e) whether any factors in R.C. 2151.414(E)(7)-(11) apply. *In re S.J.*, 2013-Ohio-2935, ¶ 15 (2d Dist.). *Accord In re P.Z.A.*, 2023-Ohio-2000, ¶ 38 (2d Dist.).

{¶ 28} In the case before us, the juvenile court discussed each of the pertinent factors. *See* Order, p. 2-6. As noted, Mother argues that the court's decision was based on insufficient evidence and was against the manifest weight of the evidence. In particular, Mother points to the factors in R.C. 2151.414(D)(1)(b), (c), and (d). *See*

Mother's Brief, p. 5. These factors include the child's wishes, the child's custodial history, and the child's need for a legally secure placement. We note that the child's wishes were not particularly significant since the child was only four years old (although the GAL indicated that L.S.F. had asked the foster parents if they could adopt her). *See* State's Ex. 14, GAL Report (May 5, 2023), p. 6. The trial court also noted the GAL had recommended that GCCS be given permanent custody. Order at p. 5.

{¶ 29} While Mother has not challenged the court's consideration of factor (a), we find it relevant that the court thoroughly reviewed L.S.F.'s relationships. The court focused on these issues: (1) Mother primarily had only supervised visitation with L.S.F. for two years; (2) Mother failed to attend many ongoing appointments addressed to the child's care; (3) Mother failed to recognize that L.S.F. had many emotional and medical needs; (4) Mother would not participate in appointments showing how to take care of a child with special needs; (5) Mother failed to recognize L.S.F.'s special needs, such as not having any change in routine, because L.S.F. would go days without eating if upset; (6) Mother failed to follow up with doctor's appointments, was unable to identify the child's goals, and lacked consistency in the child's treatment; (7) Mother needed constant coaching about L.S.F.'s diet and about the importance of schedules for L.S.F. due to L.S.F.'s "need for consistency in her life"; and (8) the foster mother had a positive impact, had been a consistent presence in L.S.F.'s life for two years, wanted to adopt her, attended all appointments, and was able to invest the time and emotional labor to make sure L.S.F.'s needs were met. *Id.* at 3-4. Consequently, the court was not just focused on Mother's drug use. Instead, the court considered many other points in deciding the

child's best interest.

{¶ 30} Regarding factor (c), the court discussed the custodial history, including that L.S.F. had been in the agency's custody for "almost half of her young life." Order at p. 5. Concerning factor (d), the court noted the following points: (1) L.S.F. had issues with uncertainty over her future and her custodial situation; (2) Mother had substance abuse issues that spanned the life of the case and would impair her ability to make safe choices for her daughter, who was too young to protect herself; (3) Mother chose to move in with R.G. rather than use the housing voucher GCCS had obtained for her; and (4) Mother had presented R.G. as someone who could do care-taking of L.S.F. even though R.G., who was disabled, had qualified for his own care-taker through the VA. *Id.*

{¶ 31} To consider the court's decision, we have reviewed the entire record, including what was recited above as well as the custody hearing transcript and exhibits. Contrary to Mother's implication, the court's decision was not simply based on an assumption, without any evidence, that Mother's drug use would be harmful to the child.

{¶ 32} As a preliminary point, L.S.F. was only two years old when she was removed from Mother's care. The removal resulted from a drug raid during which L.S.F. was present, along with syringes, illegal drugs, and other drug paraphernalia. Mother also tested positive for illegal drugs at that time and had a history of substance abuse.

{¶ 33} Mother continued to struggle with sobriety during the entire time GCCS was involved. While Mother had a few periods of relative sobriety (where she was not positive for drugs other than marijuana, which was still illegal), she tested positive for illegal drugs on many occasions. *E.g.*, Tr. at 9 and Ex. 16 (March 5, 2021, positive for meth,

amphetamines, and THC); Tr. at 13 and Ex. 23 (Dec. 13, 2021, positive for meth, amphetamines, THC, and Buprenorphine (Suboxone)); Tr. at 16 and Ex. 23 (January 20, 2023, positive for meth, amphetamines, THC and Buprenorphine); Tr. at 19 and Ex. 34 (March 17, 2023, positive for meth, amphetamines, and THC). Notably, GCCS was not testing weekly or even monthly during most of the case. However, on every test of the 20 submitted at the hearing, Mother tested positive for THC and Buprenorphine. *See* State's Exs. 16-35.

{¶ 34} At the time of the permanent custody hearing, L.S.F. was four years old, was living with a foster family, was doing really well, and had experienced quite a few special needs, including asthma and PTSD, with a lot of emotional needs stemming from the PTSD diagnosis. L.S.F. had also been involved in occupational and speech therapy and had Individualized Education Plans (IEPs) at multiple schools. Additionally, L.S.F. saw a mental health therapist every week. Tr. at 40-42.

{¶ 35} Mother attended only 14 of 37 medical appointments that had occurred since February 2023, when L.S.F. was placed in the foster mother's (Amanda's) care. *Id.* at 43 and 46-47. Before that, Amanda's mother had fostered L.S.F.; during that time, Amanda saw L.S.F. multiple times a week, and L.S.F. had become fairly bonded with Amanda's children. *Id.* at 47 and 54. Amanda had already adopted one child that she fostered and said she wished to adopt L.S.F. if the court gave permanent custody to GCCS. *Id.* at 40 and 44. On a few occasions when Mother attended appointments, Amanda had concerns, like Mother's falling asleep in the lobby and not being able to stand. Amanda observed this at a number of appointments in March 2023. *Id.* at 50.

**{¶ 36}** Concerning visitation, level one visitation between Mother and L.S.F. began on April 15, 2021, at the Visitation Center. That lasted until June 10, 2021, when level two was assigned. This level involves a little bit less supervision, but it is still supervised. Tr. at 61-62, 102-103, and 109. Mother was then stepped up to twice-weekly visits on June 29, 2021, and eventually, around November 2021, visitation was moved to Grandfather's home. Visitation stayed there and visits were unsupervised until February 2022, when visitation was again changed because Mother had just experienced a slip in her recovery. Visitation was then supervised, but at Grandfather's home, where Mother was staying. *Id.* at 62-63, 104, and 123-124. In October 2022, Mother moved into a two-bedroom apartment with R.G., a fellow veteran. Ex. 12, GAL Report (Feb. 23, 2023), p. 2-3.

**{¶ 37}** In early January 2023, Elizabeth, the GCCS aide, began transporting L.S.F. to Mother's home for visits. Elizabeth walked inside to make sure everything was safe, talked to Mother for a few minutes to ensure she was not under the influence, and then left L.S.F. for an unsupervised visit. The foster mother picked up L.S.F. at the end of the visit. These visits were twice a week for two hours. *Id.* at 64-65. During the initial time frame, Mother seemed not to be under the influence and was very polite. Mother engaged with L.S.F. and seemed to have a good rapport with her. Suddenly, around January 27, 2023, things changed. At some point before that day, Mother told Elizabeth that she suspected she may have been sexually assaulted and that drug screens had come back positive. Mother told Elizabeth that she had been "pretty much roofed."[2] In

---

[2] This term was not defined, but Mother appears to have been indicating she was given drugs without her consent, after which she was sexually assaulted.

order to protect L.S.F., the agency moved to supervised visitation at Mother's apartment but still allowed visits twice a week for two hours. *Id.* at 66-67.

{¶ 38} At her supervisor's request, Elizabeth began collecting drug screens from Mother. The screens started increasing in March 2023 and, based on the results, the supervision level went from yellow to red (the highest level). Home visits were then discontinued and moved to the Visitation Center. Yellow meant the agency had some concerns and required a supervising party to be within eye or earshot every 15 minutes. Level red required a supervising party's eyes and ears to be "on" at all times, meaning someone was always able to see and hear everything. GCCS switched to red level because of the positive drug screens. This was concerning because of the drugs that were coming back positive, i.e., meth and THC. At that time, Mother was living with her roommate, R.G. *Id.* at 67-68 and 70. Visits were moved because Mother was consistently testing positive for fairly high levels of meth, and the agency felt visits were unsafe. *Id.* at 71.

{¶ 39} Elizabeth did not have concerns until she encountered home visits at which Mother started testing positive. On March 24, 2023, Mother seemed to be unclear in what she was saying, stuttered and mumbled, appeared to have trouble sitting up straight, and seemed not really clear in her head. At that point, Elizabeth told her supervisor what was going on and asked for advice. Elizabeth was told that due to L.S.F.'s issues with change and the fact that L.S.F. had already had a difficult morning, Elizabeth should continue with red supervision, finish the visit, and then do a drug test. GCCS would then go from there. Elizabeth did drug-test Mother, and this test came back positive for meth,

amphetamines, and THC. Tr. at 71-72 and 77-78. These interactions led to the ultimate decision on March 28, 2023, to move visits to the Visitation Center. *Id.* at 70 and 72.

{¶ 40} After Amanda became involved in L.S.F.'s care in February 2023, visits occurred in Mother's home until after the first week of April 2023, when visits were switched to the Visitation Center. According to Amanda, L.S.F. was not excited to go to visits with Mother; L.S.F. would not eat prior to going and would have a very hard time getting ready. And, when L.S.F. returned home, she was "pretty wild and would have a hard day." Tr. at 52-54. Amanda believed L.S.F. was stressed out by her visits with Mother, and Amanda expressed those concerns to the caseworker and GAL. *Id.* at 54-55. L.S.F. never expressed to Amanda that she wanted to go back home to Mother. *Id.* at 55.

{¶ 41} Michelle was involved with Mother's case for almost two years, from April 2021 – first as a caseworker and then as a supervisor. *Id.* at 85. In April 2021, L.S.F. was living with Grandfather, where she had been placed on a safety plan. Michelle developed case plan objectives then and discussed them with Mother. At that time, Mother's objectives were: (1) engage in drug and alcohol assessments and follow recommendations; (2) engage in parenting classes; (3) appropriately visit L.S.F.; and (4) obtain and maintain sobriety. At the time, Mother had safe and stable housing. *Id.* at 88-89.

{¶ 42} GCCS modified the plan in May 2021 because Grandfather said he could not care for L.S.F.; as a result, the child was placed in foster care. The plan was again modified in February 2023, when L.S.F. moved into a new foster home. In addition, the

plan had previously been amended in February 2022 to add further objectives for Mother. These included attending L.S.F.'s appointments and demonstrating understanding of L.S.F.'s special needs. Obtaining safe and stable housing was also added because Mother had reportedly been homeless between August 2021 and November 2022. Along with the prior objectives, these were the case plan objectives at the time of the permanent custody hearing, as reflected in State's Ex. 8. *Id.* at 89-92.

{¶ 43} Mother completed parenting classes and also engaged in drug and alcohol abuse treatment until May 2023, when she told Michelle she had left those services. Mother also struggled to obtain housing. While Mother began staying with a roommate (R.G.) in late 2022, she decided not to move forward with a housing voucher she had obtained from the VA. Tr. at 93.

{¶ 44} According to Michelle, Mother had generally been consistent with visitation but was not nearly as consistent when visits were moved to the Visitation Center. Mother also failed to show an understanding of L.S.F.'s special needs and, in fact, stated that she did not believe her daughter had special needs. This was despite the fact that Mother knew L.S.F. had been on an IEP. Mother had also attended one IEP meeting and had attended some occupational therapy, speech therapy, and mental health appointments. *Id.* at p. 94, 115-116, and 194.

{¶ 45} Michelle testified that her major concerns were Mother's lack of understanding and ability to meet L.S.F.'s special needs and Mother's inability to maintain sobriety under stress, as Mother had relapsed in the previous several months. *Id.* at 95. At the second extension hearing in September 2022, GCCS had told Mother the biggest

barriers were housing and Mother's failure to get L.S.F. to appointments on time despite reminders about their importance. If L.S.F. did not arrive timely to appointments, she could be discharged from services. *Id.* at 105 and 115. Mother also did not have stable housing at that time. *Id.* at 125. GCCS had also told Mother since 2021 that in order for reunification to occur, Mother would have to have a medical marijuana card if she was going to screen positive for marijuana, since it was an illegal substance. Mother was still screening positive for marijuana in November 2022, but she did not have a card. *Id.* at 126 and 128-129.

{¶ 46} In December 2022, GCCS increased visitation, but Mother continued to be late for appointments. In January 2023, GCCS scheduled an overnight visit, but Mother was late getting L.S.F. to an appointment during that visit. Due to the risk of the child being discharged from services, GCCS retreated from the overnight plan. Tr. at 130-132. GCCS then continued with visitation until Elizabeth randomly drug-screened Mother. At that time (in January 2023), Mother screened positive. Although Mother reported this roofing incident to GCCS, Mother had placed herself in an unsafe situation in a home where dangerous persons and dangerous drugs were present. The agency was extremely concerned because this was what had occurred previously when Mother and L.S.F. were present during a drug raid. Mother was showing the same pattern of behavior even though the case had been ongoing for two years. *Id.* at 132-133 and 135-137.

{¶ 47} Well after January 2023, Mother continued to screen positive for meth while she claimed she was only using marijuana. This demonstrated to Michelle that even the

marijuana Mother was allegedly using medicinally was sourced in unsafe ways and was unsafe for Mother while parenting. Mother continued to struggle with sobriety after that point. *Id.* at 133-134. In fact, on May 5, 2023 (shortly before the hearing date), Mother told Michelle that she would have low levels of Suboxone on testing because she was trying to wean off substances after leaving addiction services. However, the test results from that date showed meth and amphetamines in Mother's system and no Suboxone. *Id.* at 135.

{¶ 48} The continued use of meth and amphetamines indicated that in periods of stress, Mother struggled to cope in ways that were functional for parenting purposes, and Mother failed to make safe choices for herself, which could place L.S.F. at risk. *Id.* at 135-136. Michelle stated that while she had given Mother the benefit of the doubt about the January 2023 incident, Mother's drug use thereafter had continued for far too long for it to be considered anything other than a relapse. *Id.* at 136. At the agency, the decision was unanimous that permanent custody was in L.S.F.'s best interest based on Mother's continued drug use, Mother's statement that she did not believe L.S.F. had special needs, and Mother's continued pattern of unsafe behavior. *Id.* at 139. GCCS investigated various other placements for L.S.F. but could not find any relatives willing to and capable of assuming her care. *Id.* at 139-143.

{¶ 49} The GAL's final report was filed on May 5, 2023. *See* State's Ex. 14. The GAL was also present at the permanent custody hearing. In the report, the GAL noted that L.S.F. was doing very well in her foster home, had been a part of the extended family for two years, and that a strong bond had developed. *Id.* at p. 3. L.S.F. had done well

in occupational and speech therapy and did not need further assistance at this time, but was subject to re-evaluation. L.S.F. was still in behavioral therapy every week, and the therapist stressed the importance of routine and consistency. *Id.*

{¶ 50} In addition, the GAL noted that Mother's last visit with L.S.F. had been at the end of March 2023. Mother cancelled one visit, had Covid on April 18, and failed to appear or call the Visitation Center for visits that were scheduled for May 4 and 5, 2023. *Id.* at p. 4.

{¶ 51} Like Michelle (the GCCS supervisor), the GAL expressed concern over the fact that Mother did "not fully comprehend the needs of [L.S.F.] and why she is/was in therapy." *Id.* at p. 6. Mother attended only 29 of 79 sessions, which were a "rich source of assistance in understanding" the child's needs. She also did not meet with any of the child's teachers to discuss the child's work, school progress, or IEP, and did not attend the March 2023 IEP meeting. *Id.* Furthermore, the GAL noted that R.G.'s apartment, where Mother was living, did not allow for occupancy by three individuals, and R.G. would have to move to another apartment. *Id.* The GAL further stated that if L.S.F.'s deep bond with the foster family were broken, it could have "a devastating effect on her physical and mental development." *Id.* at p. 7. Finally, the GAL recommended that permanent custody be given to GCCS. *Id.*

{¶ 52} In view of this testimony, there was ample reason for the juvenile court to find that granting permanent custody to GCCS was in L.S.F.'s best interest. Although Mother's inability to maintain sobriety was an important factor, it was not the only reason. Mother never obtained stable and appropriate housing for her child and she did not

evidence understanding of her child's difficult issues. Mother also did not try to even educate herself on what L.S.F. needed in order to become and remain physically and emotionally healthy, nor did she participate in care intended to ensure the child's welfare.

**{¶ 53}** Accordingly, Mother's sole assignment of error is without merit and is overruled.


### III.   Conclusion

**{¶ 54}** Mother's sole assignment of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .


EPLEY, P.J. and TUCKER, J., concur.